**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:24-cv-00054-TFM-B** |
| | ) | |
| **DONALD TAYLOR and JUSTIN WELLS; et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

# MOTION TO EXCLUDE OPINION TESTIMONY OF CHARLES COURREGE

Thomas O. Gaillard, III
William W. Watts, III
Helmsing, Leach, Herlong, Newman & Rouse, P.C.
150 Government Street, Suite 2000
Mobile, Alabama 36602
tog@helmsinglaw.com
www@helmsinglaw.com

*Attorneys for Defendants*
*Donald Taylor and Justin Wells*

# TABLE OF CONTENTS


I. General Principles of Admissibility of Expert Opinion Testimony .................................. 4

II. Courrege's Discussion of the *Graham* Factors and His Opinion That Those Factors Do Not Support the Level of Force Used by Corporal Taylor Are Inadmissible Legal Conclusions Usurping Role of Court and of Jury. ............................................................ 7

III. Mr. Courrege's Subsidiary Opinions, Based on His Review of the Officers' Body Cam Videos, that Plaintiff "Posed No Immediate Threat of Harm" and That She Was "Not Resisting Arrest" Require No Specialized Knowledge That Will Help the Jury Resolve These Issues, Are Based on Insufficient Facts, and Impermissibly Judge Taylor's Conduct Based on 20/20 Hindsight ..................................................................... 10

A. Opinions that Plaintiff "posed no immediate threat of harm to officers" .................. 10

B. Opinion that Plaintiff "was not resisting arrest" ....................................................... 12

IV. Mr. Courreges's Opinions that Taylor's Use of Force Exceeded the Level Necessary to Overcome the Resistance Are Inadmissible .................................................................. 15

A. Opinions of Courrege That Taylor's Use of Force Exceeded Minimum Necessary to Overcome White's Resistance ..................................................................... 15

B. Inadmissibility of Courrege's Opinions ..................................................................... 18

*1. Opinions as to nature or degree of Ms. White's resistance to arrest* ............. 18

*2. Opinions as to appropriateness of Taylor's response to Ms. Taylor's resistance* ........................................................................................... 19

*3. Opinions as to failure to de-escalate or to adopt "more appropriate" Responses* ........................................................................................... 19

*4. Opinions regarding Taylor's use of force exceeding amount necessary to overcome resistance* ........................................................................... 22

V. Courrege's Opinion That the DUI Investigation Was Not Consistent with Generally Accepted Police Practices and Sarland Police Department Policy and Procedure Is Inadmissible. ......................................................................................................... 23

VI. Courrege's Opinions that the Officers' Identification of the Capsules as Cocaine Was Not Consistent With General Police Practices and Drug Identification and Investigation Procedures Are Inadmissible ......................................................................... 24

VII. Mr. Courrege's Opinions Discussed Above Should be Excluded Under Fed. R. Evid. 403. ............................................................................................................ 26

Conclusion ........................................................................................................................ 26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA WHITE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:24-cv-00054-TFM-B** |
| | ) | |
| **DONALD TAYLOR and JUSTIN WELLS; et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MOTION TO EXCLUDE OPINION TESTIMONY OF CHARLES COURREGE**

Comes now the Defendants Donald Taylor and Justin Wells and, pursuant to Fed. R. Evid. 702, move to exclude certain opinion testimony of the Plaintiff's "police practices" expert witness Charles Courrege. Mr. Courrege's expert report is attached as Exhibit A and portions of his deposition testimony are attached as Exhibit B. In additional support of this motion, Defendants would incorporate herein their brief filed in support of their motion for summary judgment and evidence submitted in support of that motion filed concurrently with this motion.

**I. General Principles of Admissibility of Expert Opinion Testimony**

Fed. R. Evid. 702 controls determinations regarding the admissibility of expert testimony. *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote and citation omitted). Under Rule 702, the trial judge acts as a gatekeeper to screen out "speculative" and "unreliable expert testimony." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021). Rule 702 provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

To determine the admissibility of expert testimony under Rule 702, the court must ascertain whether the following three requirements are met: "(1) the expert is *qualified* to testify competently regarding the matters he intends to address; (2) the methodology by which the expert witness reaches his conclusions is *sufficiently reliable* as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony *assists the trier of fact* through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue." *City of Tuscaloosa*, 158 F.3d at 562 (emphasis added) (citing FRE 702). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). The proponent must meet such burden by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

In conducting the "reliability" inquiry, "[t]he trial judge in *all* cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *Id*. (emphasis in original) (quoting Fed. R. Evid. 702, advisory committee's note (2000 Amends.)). The expert's opinion must have "a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). Although the court's inquiry under Rule 702 must focus on the expert methodology, not his or her conclusions, *see Daubert,* 509 U.S. at 595, the court is not required to admit opinion

testimony "that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

In addition to measuring reliability, the court must determine whether the expert testimony "assists the trier of fact" in understanding the evidence or determining a fact in issue. *See Daubert*, 509 U.S. at 591. This "helpfulness" consideration focuses on the relevance of the proffered expert testimony or evidence. *See Daubert*, 509 U.S. at 591. An expert must know "facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). Further, to "assist" the trier of fact, expert testimony must concern "matters that are beyond the understanding of the average lay person. Proffered expert testimony will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262–63 (internal citations omitted). *See Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006) (expert's report "reads like the fact section of a brief, not the report of any expert witness" and the "vast majority of [the] report simply summarizes and states [the expert's] advocacy-based interpretation of documents in the record" concerning the defendant chemical company's historical conduct. Her "statements of alleged fact do not appear to benefit from, or to be based to any extent on, [her] status as a regulatory expert."). "Expert testimony is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 917 (11th Cir. 1995).

Legal conclusions are not a proper topic of expert testimony. *Plott v. NCL Am., LLC*, 786 F. App'x 199 (11th Cir. 2019). "[C]ourts must remain vigilant against the admission of legal

conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018) (quoting *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977)); *see Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 154 (11th Cir. 1990) ("A witness . . . may not testify to the legal implications of conduct; the court must be the jury's only source of law").

Finally, given the "powerfully and potentially misleading effect of expert evidence," expert opinion testimony that otherwise meets the admissibility requirements under Rule 702 may still be excluded under Rule 403 where its probative value is substantially outweighed by its potential to confuse or mislead the jury. *See Frazier*, 387 F.3d at 1263. Because expert testimony may be assigned "talismanic significance in the eyes of lay jurors," the court must "take care to weigh the value of such evidence against its potential to mislead or confuse." *Id*.

## II. Courrege's Discussion of the *Graham* Factors and His Opinion That Those Factors Do Not Support the Level of Force Used by Corporal Taylor Are Inadmissible Legal Conclusions Usurping Role of Court and of Jury.

In the first part of his "opinions and analysis" at Part VI. A.1., Mr. Courrege describes the factors applied by the United State Supreme Court in *Graham v. Connor,* 490 U.S. 386 (1989) in determining whether the force used to effect a particular seizure is reasonable and therefore constitutional. *See* Expert Report of Charles Courrege at p.7-8 (Ex. A). He then discusses each of these factors – the severity of the crime, the immediacy of the threat of danger to the officers[1], and whether the arrestee is actively resisting arrest – and applies them to what he describes as the facts, which is primarily his own highly edited description of the officers' body cam videos, without having read any depositions, including those of the Defendants West and Taylor or the

[1] Mr. Courrege omits from his description of the second *Graham* factor the question of a threat to the safety "of others." *See Graham,* 490 U.S. at 396. His report never discusses whether Cpl. Taylor could have reasonably believed that Mrs. White, although forcibly brought to a stop, continued to pose an immediate threat of harm to others in the vicinity, as she continued to sit behind the wheel of a vehicle she had just recklessly driven for some 7 ½ miles, nearly colliding with other vehicles, heedless of the emergency lights and siren of the patrol car behind her.

Plaintiff White. See Courrege Depo at 246:9-13 (Ex. B); Courrege Report at 4-5 ("facts and data considered") (Ex. A). He concludes:

> Accordingly, it is my opinion that Mrs. White posed no immediate threat of harm to the officers and she was not resisting arrest at the time of her apprehension. Although there was a government interest in effecting her detention, taken together, the *Graham* factors do not support the technique or level of force used by Cpl. Taylor." (Report at 8)

Whether the force used by an officer is excessive is a "pure question of law." *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). That question "is not a matter subject to expert testimony." *Id*. (quoting *Freund v. Butterworth*, 165 F.3d 839, 863 n.34 (11th Cir. 1999) (*en banc*)); *see, e.g., Jarvis v. City of Daytona Beach*, No. 6:23-CV-508-JSS-RMN, 2024 WL 3325938, at *1–2 (M.D. Fla. July 8, 2024)(excluding as legal conclusions expert's opinions that defendants application of force was "unreasonable" or "unjustifiable"); *Bolton v. Wood*, 682 F. Supp. 3d 1304, 1317 (N.D. Ga. 2023) (declining to consider, as "pure question of law," expert's opinions that force defendant used was "unnecessary" and "excessive" because plaintiff was not an immediate threat to defendants or others); *Lizarazo v. Greaves,* No. 1:16-cv-20558-UU, 2018 WL 78224943, *2 (S. D. Fla., June 21, 2018) ("[A]llowing an expert witness to tell the jury whether the [d]efendants used excessive force would essentially remove from the jury the task of applying standards of reasonableness and replace it with the task of evaluating the testimony of the parties' experts"); *Washington v. City of Waldo, Fla.*, No. 1:15CV73-MW/GRJ, 2016 WL 3545909, at *4 (N.D. Fla. Mar. 1, 2016) (excluding expert witness opinions "that [officer] used excessive force in effectuating [an] arrest, as such testimony 'offers nothing more than what lawyers for the parties can argue in closing arguments []'") (quoting *Frazier,* 387 F.3d at 1262-63).

Mr. Courrege's opinion that "the *Graham* factors, taken together, do not support the level of force use by Cpl. Taylor" is a backhanded way of opining that Cpl. Taylor's use of force was excessive, an inadmissible legal conclusion invasive of the court's own province in resolving this question of law and/or the jury's province in applying the law to any disputed facts, as instructed by the court. Mr. Courrege's discussion of and weighing of the *Graham* factors to determine the "reasonableness" of Cpl. Taylor's use of force are not matters requiring any specialized knowledge or skill possessed by Mr. Courrege but rather involve pure legal questions to be determined by the court or, if material facts are in dispute, by a properly instructed jury. *See Wood v. Showers*, 822 F. App'x 122, 124 (3d Cir. 2020) (expert's testimony about application of *Graham* factors to opine that officer's use of force in taking plaintiff to the ground was excessive was properly excluded; it is the court's duty, not that of expert witness, to explain law to jury); *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006) (expert's opinion that "a reasonable officer on the scene would not have concluded at the time that there existed probable cause that Mr. DeMerrell posed a significant threat of death or serious physical injury to the officer or others" was an inadmissible legal conclusion); *Dold v. Snohomish Cnty.*, No. 2:20-CV-00383-JHC, 2023 WL 123335, at *4 (W.D. Wash. Jan. 5, 2023) *(*expert's opinions about how *Graham* factors applied were inadmissible; opinions about reasonableness of deputies' conduct usurped role of jury and opinions about the "legal standard of reasonableness" usurped role of court).

Highlighting the fact that Plaintiff's expert is improperly attempting to assert legal conclusions as opinion testimony in this case is Mr. Courrege's own statement describing his opinions as "the aforementioned constitutional-based analysis . . ." (Courrege Report at 8 (Ex. A)). It is not the province of this "police practice" expert to provide legal opinions about the

constitutionality of the force employed by Cpl. Taylor. Those types of opinions offered by an expert invade the duty of the court to say what the law is and how it applies to the facts of this case.

## III. Mr. Courrege's Subsidiary Opinions, Based on His Review of the Officers' Body Cam Videos, that Plaintiff "Posed No Immediate Threat of Harm" and That She Was "Not Resisting Arrest" Require No Specialized Knowledge That Will Help the Jury Resolve These Issues, Are Based on Insufficient Facts, and Impermissibly Judge Taylor's Conduct Based on 20/20 Hindsight

### A. Opinions that Plaintiff "posed no immediate threat of harm to officers"

Mr. Courrege's narrative description of the facts in this case are heavily edited in Plaintiff's favor and involve his own characterization of those facts, based on his review of the body cam videos with 20/20 hindsight, and omitting significant undisputed facts that are not helpful to his analysis. He describes her as a "73-year old, 5ft. 3", 145lb, 'confused' female, who was seated and restrained in her vehicle, display[ing] no apparent intent to harm the five police officers that approached her vehicle." (Report at 8). This is a narrative by someone with 20/20 hindsight and involving information not available to or observable by the Officers as they approached the vehicle and attempted to remove Ms. White from it. He describes Ms. White as being "pulled out of the car before she could comply," an opinion not helpful to the jury which can make its own assessment of whether she had time to comply. He describes her hands as "presumably . . . always visible to the officers," an opinion that contradicts the officer's testimony (Wells Depo at 53:1-9) (Ex. C) and is not otherwise supported by any facts. He opines that the Plaintiff "posed no immediate threat to the officers," based on his review of the officers' body cam videos and other material not available to Cpl. Taylor at the time (such as her age, height and body weight). He opines that her "physical ability to overpower and harm the officers to any degree of concern is minimal, at best," and "her actions of responding slowly to

commands did not create a credible and immediate threat to the officers' safety." (Courrege Report at 8).

First, these opinions of Courrege as to whether Ms. White posed any immediate threat to the officers, based on his review of the officers' body cam videos, require no technical or specialized knowledge on his part and are not helpful to a jury in reviewing those videos and reaching their own conclusions as to the existence of a threat of harm to Taylor or the other officers. Expert testimony is not required "to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Associates Ltd.*, 50 F.3d at 917. An expert's interpretation of a video is "not helpful because it [does] not offer anything the jury could not discern on its own." *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021). A jury "[does] not need [an expert] to tell them what they could plainly see for themselves." *Id; see Doe v. Magical Cruise Co. Ltd.*, No. 23-12816, 2024 WL 3649037, at *4 (11th Cir. Aug. 5, 2024) (district court did not err ignoring expert's testimony as to what video showed and granting summary judgment; court "was perfectly capable of watching the video and deciding for itself whether the video showed a sexual assault."); *Wroblewski v. Tyler*, No. 3:17CV146-M, 2018 WL 5261202, at *4 (N.D. Miss. Oct. 22, 2018) (expert's opinions, based on review of video evidence, as to whether plaintiff posed safety risk, held inadmissible; jury was capable of deducing that issue based on its own viewing of videos)

Second, Mr. Courrege's opinion as to whether the Plaintiff posed a threat to the officers is inadmissible because his analysis employs the kind of 20/20 hindsight of an officer's conduct expressly forbidden under *Graham*. *See Baxter v. Santiago-Miranda*, 121 F.4th 873, 891 (11th Cir. 2024) (expert's testimony that "no reasonable officer would have perceived an immediate threat justifying lethal use of force" is "the exact kind of 20/20 hindsight we do not engage in;"

summary judgment based on qualified immunity affirmed)(citing *Graham*, 490 U.S. at 396).

Third, Mr. Courrege's opinions about a threat of harm to the officers are legal conclusions, *see* authorities *supra* at 5-6, as well as being an improper statement of the relevant legal standard. The legal standard is not whether Plaintiff did or did not pose a threat to the safety of the officers but *whether a reasonable officer in Cpl. Taylor's position could have believed* that the plaintiff's conduct posed an immediate threat to such officers. And the standard considers whether such a reasonable officer could have believed there was a threat to the safety of officers "*or others.*" *Graham,* 490 U.S. at 396. Even if the proper legal standard had been addressed, Courrege's opinions about such a threat of harm would be a legal conclusion to be determined by the court. *See* authorities *supra* at pg. 5-6.

Finally, Mr. Courrege's opinions as to the existence of a threat of harm are based on insufficient facts or data and are unreliable. His narrative report never considers the undisputed movement of Ms. White's body back towards the vehicle, as shown on Cpl. Wells body cam, as Cpl. Taylor attempted to escort her out of the vehicle, before resorting to pulling her out. And Cpl. Taylor, in his deposition, describes his concern that she might have been reaching for a weapon. (Taylor Depo at 56-57) (Ex. d). Courrege did not review any of the depositions in reaching his opinions.

**B. Opinion that Plaintiff "was not resisting arrest"**

Turning to the third *Graham* factor – whether the Plaintiff was actively resisting arrest – Mr. Courrege opines that, once the doors were unlocked, Mrs. White "claims she was trying to follow the orders" but that "Cpl. Taylor gave no time for compliance and pulled her from the vehicle — all while never giving her a verbal warning or command other than to 'relax.'" (Report at 8). He opines that "she was not resisting arrest at the time of her apprehension." (Id.)

His narrative report is completely silent about the undisputed movement of Ms. White's body back towards the vehicle, as shown on Cpl. Wells body cam, as Cpl. Taylor attempted to escort her out of the vehicle, before resorting to pulling her out.

For the same reasons that Mr. Courrege's opinions are inadmissible as to the absence of a threat of harm to the officers, his opinions as to whether Plaintiff was resisting arrest are inadmissible:

(1) This testimony is a legal conclusion;

(2) it misstates the legal standard by failing to frame his opinions from the standpoint of a reasonable officer in Taylor's position, *see Graham,* 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight");

(3) it does not require any technical or specialized knowledge possessed by Mr. Courrege;

(4) it does not assist the jury in reaching its own determination as to whether a reasonable officer in Taylor's position could have interpreted her actions as actively resisting arrest based on their own review of the body cam videos and the testimony at trial, *see McGough v. Penzone*, No. CV-18-01302-PHX-DJH, 2021 WL 1575054, at *3 (D. Ariz. Apr. 22, 2021)(expert's opinions as to nature of plaintiff's resistance, based on his review of body cam videos, would not assist jury in reaching their own determinations after reviewing videos)*; Wroblewski*, 2018 WL 5261202, at *4 (expert's opinions regarding nature of plaintiff's resistance, based on review of video evidence, held inadmissible; jury was capable on its own review of videos to deduce whether plaintiff was actively resisting);

(5) it reviews Taylor's conduct with 20/20 hindsight; and

(6) it is based on insufficient facts or data and is unreliable, Mr. Courrege having failed to review any deposition testimony. Indeed, he admitted that, in order to evaluate how "forceful" Ms. White's resistance was, in pulling back from Cpl. Taylor, he "would have to hear Corporal Taylor's testimony or Ms. White's testimony." (Courrege Depo at 158:12-14)

Additionally, under Mr. Courrege's own definition of "active resistance," the body movements of Ms. White in response to Corporal Taylor's efforts to guide her out of the vehicle would constitute such active resistance. He defines "active or defensive resistance" as "physically evading the officer's control by pushing, pulling, bracing, or any other act that would prevent the officer from gaining control but not an attack on the officer." (Report at 9) (Ex. A). A fair viewing of the screen shots from that segment of Wells' body cam video clearly shows Mrs. White **pulling** back against Corporal Taylor's initial efforts to ease her out of the vehicle, her body moving back into or toward the interior of the vehicle. *See* Notice of Filing Evidentiary Materials, item number six (Def. Ex. 2 to White Depo.). Ms. White conceded in her deposition that Corporal Taylor could have reasonably concluded that she was actively resisting by pulling back against him (White Depo., 183:17-184:2). In his deposition, Courrege admits that the actions of Ms. White in pulling back against Corporal Taylor (evidence which he omitted from his report) "could fit the definition of active resistance if she was intentionally engaged in that to try to overcome the Officer's force." (Courrege Depo. at 158-159) (Ex. B). He makes a distinction based upon the subjective intentions of Ms. White in pulling away. *See* Courrege Depo. at 159:10-12 ("We have to evaluate the totality of the situation and say was this person really resisting or is this a response to what I am doing."); 172:16-19 ("It is a well understood principle that there is going to be a reaction to your force and it doesn't mean that's an intentional resistance."). These distinction highlights the fact that Mr. Courrege's opinion that

Ms. White was not resisting arrest by Corporal Taylor is based upon not what a reasonable officer in Corporal Taylor's position could have interpreted as active resistance upon what Ms. White subjectively intended in pulling away. Also, this highlights the lack of any helpfulness of Mr. Courrege's opinions as to whether Ms. White's body movements could be interpreted by a reasonable officer as active resistance: A jury is equally competent to make that decision based on its own review of the video evidence and testimony at trial.

## IV. Mr. Courreges's Opinions that Taylor's Use of Force Exceeded the Level Necessary to Overcome the Resistance Are Inadmissible

### A. Opinions of Courrege That Taylor's Use of Force Exceeded Minimum Necessary to Overcome White's Resistance

Under Part VI. A.2. of his Report, under the heading "The Level of Force Used by an Officer Must Not Exceed That Which Is Necessary to Overcome the Resistance," Mr. Courrege describes two "commonly utilized use of force and defensive tactics training programs" – the "Human Factor Research Group -Threat Pattern Recognition" (HFRG) and "Strategic Sefl-Defense & Gunfighting Tactics" (SSGT) – and the "National Consensus Policy on the Use of Force" (the "National Consensus Policy") as identifying three levels of subject resistance – broadly classified as "passive or verbal non-compliance," "active or defensive resistance," and "aggressive" – and corresponding levels of officer response or control to those three types of resistance. (Report at 9). He admits that these training protocols and National Consensus Policy recognize that a formal "force continuum" is becoming a "less accepted practice" in favor of an "integrated" or "constitutional-based" use of force approach described in Part VI. A.1. of his Report and that the *Graham* decision "warned of attempts of mechanical application" in the review of use of force encounters. (Id.) Nevertheless, the "defensive tactics" described in these training programs are "generally accepted in police practices and use of force training as

reasonable responses to the corresponding levels of resistance." (Id.)

Then, amidst a long narrative of his own subjective characterization of the "facts," Courrege scatters a number of opinions. He first opines (1) that Ms. White's "only 'resistance' to the officers was moving too slowly for Cpl. Taylor's patience;" (2) that Taylor "gave no time for the 'confused' 73-year-old to meaningfully comply;" (3) that Ms. White's actions "were not considered 'resistance' as applied in a police practice and use of force context;" (4) that "a more appropriate response would have been for the officers to slow down, assess the situation for what it was based on all of their new observations – a 73-year-old woman looking confused and disoriented who posed no physical threat – and attempt verbal de-escalation or 'officer/citizen-verbal direction;" and (5) that if Cpl Taylor had "taken a moment to assess the potential dangers, he would have realized the vehicle was in DRIVE and it was unsafe to remove the person in control of the vehicle in a dynamic fashion." (Report at 10)

Courrege then quotes from the National Consensus Policy defining "de-escalation" and directing how it should be employed (Report at 10-11). He then opines that (1) "Cpl. Taylor's actions and the time before he resorted to physical force completely disregarded generally accepted de-escalation practices and Saraland Police Department's verbal direction policy/procedure" (without identifying either of these)[2]; (2) that "there was no attempt to stabilize the situation and allow for Mrs. White to comply – as would be expected with a 'suspect' in this physical condition"; that Mrs. White's actions would be described as "verbal non-compliance" and that "an appropriate response" to such verbal non-compliance would be "verbal direction and eventually, if not heeded, soft hand control techniques" and that Cpl.

[2] If, by the Department's "verbal direction policy/procedure," he means the language he cites from the "service weapons" policy that he quotes at p. 9-10 of his report, a cursory review of that language shows that it simply charges officers with knowledge of the law of the United States and the State of Alabama with regard to when and how force may be used and then simply divides the amount of force used in gaining control of a subject into categories, without describing when any particular category of force is appropriate or inappropriate.

Taylor gave no verbal directions other than to 'relax" and used force that exceed[ed] soft empty had control;" that once the door was opened, "Mrs. White's action of remaining seated, at best, could be described as passive resistance because she did not attempt to defeat Cpl. Taylor's attempt to touch or control her" (Report at 11)

Courrege then cites to the HFRG, describing the selection of a response to "passive resistance," with the objective of resolving the situation "using a control technique that will be effective and has the least potential for injury to officers and subjects." (Report at 11). He then describes Cpl. Taylor's action of pulling Ms. White from her vehicle as a "straight armbar takedown" and that the HFRG provides for the use of this technique during "defensive resistance as when a subject is pulling or pushing away to defeat the officer's control." (Id). He opines that Cpl Taylor's report mentions that Mrs. White "began to grab what appeared to be the steering wheel to prevent officers from pulling her from the vehicle" and that if she had "completed" this grip and her "73-year-old grip prevented Cpl. Taylor and his backup from continuing to 'guide her' from the vehicle, then perhaps her actions would be defensive resistance." (Id.). But "based on the totality of the circumstances, it is more reasonable to perceive Mrs. White's actions as a reaction to being pulled without warning and without having time to steady and balance herself for the exit." (Id. at 12) "Or perhaps," Courrege speculates, "she was attempting to place her vehicle in "PARK" so that she could safely exit and not injure herself or the officers." (Id.) He fails to suggest the possibility that a reasonable officer in Taylor's shoes could have believed she might be reaching for weapon or continuing to operate her vehicle in a dangerous manner, the very things Taylor testified were his concerns (Ex. D). He opines that "Mrs. White's age and physical condition should have been considered before forcing her to uncontrollably fall onto the roadway from any elevation and likely should have been avoided barring extraordinary

circumstances that did not exist here." (Id.) Again he does not cite any evidence that Taylor knew that she was elderly or that she had some physical condition that made her particularly vulnerable to injury.[3]

In conclusion, Courrege opines that (1) "the use of force employed by Cpl. Taylor of forcibly pulling Mrs. White from the vehicle without giving her orders or time to comply with orders from other officers to exit the vehicle is not consistent with generally accepted de-escalation and use of force principles;" that (2) "assuming Mrs. White was verbally or passively resisting, Cpl. Taylor's actions exceeded the level of force necessary to overcome the resistance because Cpl. Taylor's actions created a substantially high risk of injury to Mrs. White compared to no apparent risk of harm to the officers;" and that (3) "[i]n addition to de-escalation, other less dangerous options such as strength techniques, joint locks, or pressure points would have been more appropriate under these circumstances." (Report at 12).

**B. Inadmissibility of Courrege's Opinions**

***1. Opinions as to nature or degree of Ms. White's resistance to arrest***

Many of the above opinions are inadmissible for the same reasons discussed above for the inadmissibility of Courrege's opinions under Part VI. A.1. of his report. His opinions characterizing the nature or degree of Ms. White's resistance are (1) legal conclusions; (2) they misstate the legal standard by which to measure this resistance by failing to consider what a reasonable officer in Cpl. Taylor's shoes could reasonably have perceived about her conduct; (3) these technical categories of resistance do not assist the jury in reaching its own determination, based on their own review of the body cam videos and other evidence, as to whether a reasonable officer in Taylor's position could have interpreted her conduct as actively resisting arrest; and (4)

---

[3] If Courrege had read Taylor's deposition he would have known that Taylor testified that he did not know she was "elderly;" she appeared "middled-aged" (Taylor Depo at 92:11-15).

they are based on insufficient facts or data, Courrege having failed to review the depositions and thus having an inadequate understanding of what Taylor knew or observed in the course of his arrest of Ms. White.

#### *2. Opinions as to appropriateness of Taylor's response to Ms. Taylor's resistance*

Because Courrege's opinions relating to the appropriateness of Taylor's conduct depend upon his inadmissible characterization of Ms. White's resistance, these opinions are admissible as lacking an adequate foundation.

#### *3. Opinions as to failure to de-escalate or to adopt "more appropriate" responses*

In his concluding paragraph, Courrege renders opinions describing appropriate "de-escalation" principles and what would have been "more appropriate" responses by Taylor to the circumstances confronting him. He opines (1) that Cpl. Taylor's conduct was not consistent with "generally accepted de-escalation and use of force principles," in pulling Ms. White from the vehicle "without giving her orders or time to comply with orders from other officers to exit the vehicle" and (2) that "[i]n addition to de-escalation, other less dangerous options such as strength techniques, joint locks, or pressure points would have been more appropriate under these circumstances." (Report at 12). These opinions are inadmissible because "[T]he Fourth Amendment does not require officers to use the "least intrusive" or "even less intrusive" alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable." *Menuel v. City of Atlanta*, 25 F.3d 990, 996–997 (11th Cir. 1994). The question of whether the force used in making an arrest is unconstitutionally excessive does not turn on whether a "more reasonable" approach might have existed for the arrest of Ms. White but simply on whether Taylor's conduct was "reasonable" under the *Graham* analysis. *Salter v.*

*McNesby*, No. 3:06CV110/MCR, 2007 WL 9734764, at *1 (N.D. Fla. Sept. 11, 2007). As the Supreme Court noted in *U. S. v. Sharpe,* 470 U.S. 675, 686-687 (1985), in the context of evaluating the reasonableness of the duration of a detention:

> "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable.' The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." (internal citations omitted).

In *Leonard v. Tony*, No. 23-10244, 2023 WL 6142188 (11th Cir. Sept. 20, 2023), the Eleventh Circuit held that summary judgment for the defendants was not precluded by an expert's testimony that certain de-escalation techniques should have been employed by the defendants. *Id*. at *4. "[S]o long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot succeed by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate or even reckless." *Id.* (quoting *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 813–814 (11th Cir. 2017), quoting in turn *Sheehan,* 575 U.S.at 615).

The failure to employ "de-escalation" practices or adopt "more appropriate" responses to victim resistance is irrelevant to the *Graham* test for reasonableness; thus, an expert's testimony on such matters is inadmissible. *See Sapp v. Marcum*, No. 6:21-CV-1515-PGB-DCI, 2023 WL 3965718, at *5 (M.D. Fla. June 13, 2023) (holding inadmissible expert's de-escalation theory that officers failed to consider options other than deadly force, such as negotiating with plaintiff from a position behind cover, which went to "tactics" officers employed at time of encounter; "improper, or even bad tactics" on part of officers does not give rise to Fourth Amendment claim) (citing *City & Cnty of San Francisco, Calif. v. Sheehan,* 575 U.S. 600, 615

(2015)).

A number of Courrege's other subsidiary opinions depend upon these principles of de-escalation or what would have been a "more appropriate" response and are thus inadmissible for the same reasons – (1) that Taylor "gave no time for the 'confused' 73-year-old to meaningfully comply;" (2) that "a more appropriate response would have been for the officers to slow down, assess the situation for what it was based on all of their new observations – a 73-year-old woman looking confused and disoriented who posed no physical threat – and attempt verbal de-escalation or 'officer/citizen-verbal direction;" and (3) that if Cpl Taylor had "taken a moment to assess the potential dangers, he would have realized the vehicle was in DRIVE and it was unsafe to remove the person in control of the vehicle in a dynamic fashion – one of the many benefits of de-escalation;" (4) that "Cpl. Taylor's actions and the time before he resorted to physical force completely disregarded generally accepted de-escalation practices" as described in the National Consensus Policy on Use of Force; (5) that these de-escalation practices were disregarded by Taylor in that "there was no attempt to stabilize the situation and allow for Mrs. White to comply – as would be expected with a 'suspect' in this physical condition"; (6) that under HFRG and SSGT principles, Mrs. White's actions would be described as "verbal non-compliance" and that "an appropriate response" to such verbal non-compliance would be "verbal direction and eventually, if not heeded, soft hand control techniques, and that "Cpl. Taylor gave no verbal directions other than to 'relax" and used force that exceed[ed] soft empty hand control;" (7) that once the door was opened, "Mrs. White's action of remaining seated, at best, could be described as passive resistance because she did not attempt to defeat Cpl. Taylor's attempt to touch or control her," and that the HFRG directs that "pressure points, joint locks or strength locks" would be the "appropriate responses" to such passive resistance, assuming White had been given

sufficient time to comply with orders; (8) that the HFRG prescribes the selection of a response to "passive resistance" with the objective of resolving the situation "using a control technique that will be effective and has the least potential for injury to officers and subjects" and that Cpl. Taylor's action of pulling Ms. White from her vehicle was a "straight armbar takedown" that the HFRG allows only during "defensive resistance as when a subject is pulling or pushing away to defeat the officer's control;" and (9) that "Mrs. White's age and physical condition should have been considered before forcing her to uncontrollably fall onto the roadway from any elevation and likely should have been avoided barring extraordinary circumstances that did not exist here." (Report at 10-11).

#### 4. *Opinions regarding Taylor's use of force exceeding amount necessary to overcome resistance*

In his final concluding paragraph in Part A.2., Courrege also opines that (2) "assuming Mrs. White was verbally or passively resisting, Cpl. Taylor's actions exceeded the level of force necessary to overcome the resistance because Cpl. Taylor's actions created a substantially high risk of injury to Mrs. White compared to no apparent risk of harm to the officers" (Report at 12).

This opinion is not admissible because the Constitution does not require that, in attempting to arrest a suspect who resists arrest, officers are to use no more than the level of force necessary to overcome that resistance. *See Menuel*, 25 F.3d at 996–997 and other authorities cited *supra* at pp. 15-17. Rather, the test is whether what the arresting officers did was reasonable. 25 F.3d at 997. Further, this opinion rests upon premises unsupported by the evidence, i.e., that Taylor's actions created a substantially high risk of injury to Ms. White or that there was no apparent risk of harm to the officers. And Mr. Courrege's opinions on these matters are not helpful to the jury which can reach its own conclusions based on its own review of the video evidence and other testimony. Finally, the question is not what these risks may have

been with 20/20 hindsight but what they could have appeared to be from the vantage point of a reasonable officer in Cpl. Taylor's shoes at that moment. Mr. Courrege has not framed his opinions in this light.

## V. Courrege's Opinion That the DUI Investigation Was Not Consistent with Generally Accepted Police Practices and Sarland Police Department Policy and Procedure Is Inadmissible.

In Part VI.B. of his report, Courrege opines that the defendants violated Saraland Police Department's "Traffic Procedures" policy by failing to perform a Standard Field Sobriety Test (SFST) on Ms. White and thus were "unable to reliably determine with any degree of certainty whether the indicators they observed were actually caused by a controlled substance or alcohol, or perhaps were symptoms of medical condition or emergency." (Report at 13). This opinion is inadmissible because, first, Courrege had insufficient facts or data upon which to render this opinion. The undisputed deposition testimony in this case is that the SFST was not performed because Mrs. White requested medical treatment which trumps any requirement to do a SFST under the Police Department's policy. See Wells Depo at 84:23-85:3 (Ex. C) and Deposition of Devin O'Shea at 95:22-96:5 (Ex. E). Second, the question of whether the defendants had probable cause to arrest her for DUI is a legal conclusion as to which expert testimony is inadmissible. See *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 515 (11th Cir. 2019) (plaintiff's allegation that affidavit executed by Defendant did not establish probable cause was a legal conclusion); *United States v. Lindsey,* 482 F.3d 1285, 1292 n.5 (11th Cir. 2007) (describing issue of whether probable cause existed to justify arrest as a "legal conclusion"); *Washington*, 2016 WL 3545909, at *4 (excluding testimony of expert that officer lacked probable cause to arrest plaintiff).

Courrege also opines that the Officer's observation of Ms. White's physical manifestations "were inconsistent with that of cocaine impairment" as described in a certain SFST certification course. (Report at 14) This opinion is inadmissible because irrelevant: Having not read the depositions, Mr. Courrege was ignorant of the fact that Officer Wells testified that he did not arrest Mrs. White due to a belief that she was under the influence of cocaine but rather of some other controlled substance (Wells Depo., 97:5-22)(Ex. C)

## VI. Courrege's Opinions that the Officers' Identification of the Capsules as Cocaine Was Not Consistent With General Police Practices and Drug Identification and Investigation Procedures Are Inadmissible

In part VI.C. of his report, Mr. Courrege opines that he has "never personally seized nor am I aware of a seizure of powder cocaine in capsule form" and that he "would find it highly unlikely to encounter such because swallowing the cocaine would be the least effective way to experience the high compared to the common methods of snorting or injecting." (Report at 15). He also opines that **"mere reliance on a presumptive test kit to establish probable cause would be inconsistent with basic drug identification and investigation procedures."** (Report at 16) (emphasis added). And he opines that, after looking at photographs of the actual test results, "it does not appear that there is a clear delineated pink over blue" but rather a "pink and blue mixture as would be expected in step one when breaking the first ampule." (Report at 16). He finally opines:

> "Lacking a clear result from the test, combined with the irregular capsulation of the powder, the officers **should have had serious doubt that the substance was cocaine**. Instead of making an arrest at that time, the officers simply should have submitted the capsules to the crime lab for analysis and taken action upon receipt of the results.
>
> Accordingly, it is my opinion that the **officers' conclusion that the substance in the 26 capsules was cocaine based on the circumstances at hand was not consistent with generally accepted police practices and drug identification and investigation procedures."** (Report at 16) (emphasis added).

The emphasized language in the above quotes from the Report are Mr. Courrege's opinions, in various forms, that the officers lacked probable cause for the arrest for possession of a controlled substance. Again, whether or not probable cause existed is a legal conclusion as to which expert testimony is inadmissible. *See* discussion *supra* at p. 23. The courts have held with unanimity that a positive field test provides officers with probable cause for an arrest for the possession of cocaine or other controlled substances even though that positive test is later refuted by further lab testing. *See* Defendant's Brief in Support of Motion for Summary Judgment at p. 26. Furthermore, this opinion is unreliable based on "basic drug identification and investigation procedures" that Courrege does not identify.

Further, Courrege's opinions are inadmissible as to what he saw from a single photograph of the actual test results, leading him to opine that a "clear result" from the test was "lacking." The language that he quotes from the test kit manufacturer's warnings show on its face that one cannot make a valid determination based upon looking at one photograph of the test results; one must observe a process over time. As the warning provides:

> "Cocaine HCL will dissolve a Blue solution in the 1st ampoule, where Cocaine Base will not dissolve and form Blue specks in a Pink solution. Both forms of Cocaine will develop a Pink solution in the 2nd ampoule and Pink over Blue solution in the 3rd ampoule. To eliminate all false positives or other caine [sic] substances, watch for the specific bursting of Blue after the breakage of the third ampoule, prior to development of Pink over Blue." (Courrege Report 16)

Thus, Courrege's opinion that there was not a "clear result" from the test is inadmissible because based upon insufficient facts or data and is based upon an unreliable methodology in forming that conclusion simply based upon a review of one photograph of the test kit.

Mr. Courrege's doubts about finding cocaine in capsule form are purely subjective, based upon his own experience in failing to encounter a seizure of powder cocaine in capsule form.

The opinion is based on nothing more than his *ipse dixit.* This is a insufficient basis for an opinion. *See Daubert*, 509 U.S. at 590 (stating that expert's methodology should not be founded on subjective belief or unsupported speculation); *Frazier*, 387 F.3d at 1265 (finding expert's opinion unreliable because he offered little in the way of a reliable foundation basis for his opinion); Fed. R. Evid. 702, Advisory Committee Note ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.")

**VII. Mr. Courrege's Opinions Discussed Above Should be Excluded Under Fed. R. Evid. 403.**

Fed. R. Evid. 403 provides:

> "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

In addition to the opinions of Mr. Courrege being inadmissible under Rule 702, as outlined above, alternatively, each of these opinions should be excluded due to their probative value being substantially outweighed by a danger of unfair prejudice, confusing the issues and/or misleading the jury.

**CONCLUSION**

For all these reasons, the Defendants submit that Mr. Courrege's opinions, as outlined above, should be excluded from the trial proceedings.

*s/ William W. Watts, III*
THOMAS O. GAILLARD, III
WILLIAM W. WATTS, III
*Attorney for Defendants Donald Taylor and Justin Wells*

**OF COUNSEL:**
HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, AL 36652
(251) 432-5521
E-Mail: tog@helmsinglaw.com
www@helmsinglaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of February 2025, a true and correct copy of the foregoing was served by e-mail and/or United States mail, First-Class postage prepaid and properly addressed to the following:

Joseph S. Dennis, Esquire (*joseph@taylormartino.com*)
Taylor Martino, PC
Post Office Box 894
Mobile, AL 36601
***Attorney for Plaintiff***

*/s/ William W. Watts, III*
OF COUNSEL

4886-2778-3673, v. 1