# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**

**PATRICIA WHITE**

**VERSUS** **NO.: 1:24-CV-00054**

**DONALD TAYLOR, *ET AL.***

# EXPERT REPORT OF C. SCOTT COURREGE

## I. INTRODUCTION

I have prepared the following report regarding the above-captioned matter. I have reviewed the evidence available to me to date, and I have formed opinions that address general police practices, drug identification and investigations, DUI investigations, and use of force principles. If additional discovery, information, or evidence becomes available, I reserve the right to amend or supplement my opinions accordingly.

## II. RULE 26(a)(2)(B)

(i) A complete statement of my opinions and the basis and reasons for them are set forth in Sections "V" and "VI";
(ii) The facts and data considered in forming my opinions are set forth in Section "IV";
(iii) My Curriculum Vitae (CV) is attached to this affidavit as Exhibit "A" and is incorporated herein *in extenso*, and my fee schedule is attached as Exhibit "B";
(iv) My qualifications and publications are set forth in Section "III" and the attached CV;
(v) My testimony within the previous four years is set forth in Section "III.C" and the attached CV; and
(vi) My fee schedule for this matter is attached as Exhibit "B".

## III. QUALIFICATIONS

### A. PROFESSIONAL EXPERIENCE

In June 2000, I first became employed in law enforcement with the Harrison County Sheriff's Office in Mississippi as a Community Service Officer and as a Reserve Deputy Sheriff. In July 2001, I transferred to the Gulfport Police Department as a Police Officer. In both roles, I engaged in generalized uniform policing duties that included, but were not limited to, responding to calls for service, writing reports of investigation, conducting follow-up investigations, arresting suspects, performing traffic and pedestrian stops, testifying in court, and initiating proactive patrols.

In May 2003, I was hired by the United States Border Patrol as a Patrol Agent and was assigned to the Brownfield Station in San Diego, California. In this uniformed position, I was tasked with immigration enforcement operations on the United States/Mexico border. My



EXHIBIT A

assignments included both fixed checkpoints and roving patrols. I was responsible for detecting and apprehending undocumented immigrants and drug traffickers through traffic stops, bus checks, and tracking. I later transferred to the San Diego Sector Air Mobile Unit as a Senior Patrol Agent. My job duties shifted to intelligence-driven and specialized proactive enforcement operations, often in high-trafficking areas. I was also temporarily assigned to special duty in Ajo, Arizona.

In January 2006, I was hired by the Drug Enforcement Administration (DEA) as a Special Agent and was assigned to the Sierra Vista Resident Office within the Phoenix, Arizona Field Division. In this plain clothes position, I primarily performed covert federal and state drug investigations. My duties included, but were not limited to, general investigations, physical surveillance, undercover operations, informant management, arresting suspects, drafting and executing search warrants, tactical operations, and utilizing extensive electronic surveillance techniques.

In January 2008, I began a security director position with a diamond cutter in Boca Raton, Florida. As such, I planned and executed covert security operations within the United States, Africa, and Europe. I also coordinated the import and export of diamonds and large sums of currency.

In April 2009, I was hired by the East Baton Rouge Sheriff's Office in Louisiana as a Deputy Sheriff and was ultimately promoted to the rank of Detective-Sergeant. I held positions in Uniform Patrol, Community Policing Unit, Special Community Anti-Crime Team, Narcotics, and Training. In addition to the uniformed policing and narcotics investigator duties mentioned in the above paragraphs, my other duties in these positions included, but were not limited to, supervising narcotics investigations, providing guidance directed to specific operational issues, developing and instructing in-service and academy training courses, policy and procedure drafting, review, and revision, and consulting with office legal counsel on use of force cases.

In January 2022, I founded Courrege Consulting Group, LLC, wherein I offer contract services as a law enforcement expert, consultant, and trainer. I have developed and routinely instruct courses on current legal trends and updates of law, use of force, narcotics investigations, search and seizure, search warrant drafting and execution, stop and frisk, and pursuit liability. Additionally, I have been engaged to review and provide professional opinions regarding policy and procedure, use of force, emergency vehicle operations, pursuits, drug investigations, and search and seizure.

## B. TRAINING AND CERTIFICATIONS

In my law enforcement career, I have completed four police academies: (1) Southern Regional Public Safety Institute; (2) Federal Law Enforcement Training Centers, Border Patrol Basic Training; (3) DEA Basic Agent Training; and (4) Capital Area Regional Training Academy. Combined, these academies exceeded 60 weeks of formal training and extensively covered the areas of use of force, defensive tactics, firearms, search and seizure, search warrants, constitutional considerations, emergency vehicle operations, pursuits, specialized investigative techniques, interview and interrogation, and tactical operations.

I have attended over 20 additional training courses, some of which included extensive study of human performance and the effects that stress has on perception and decision-making, particularly in use of force situations (Force Science Analyst and Advanced Specialist certifications). I have applied this information and training to officer involved shootings in order to evaluate the reasonableness of the shooters' actions and the limitations of human performance during those encounters.

I have been recognized by the Louisiana POST Council as a "Subject Matter Expert" in order to perform instruction and hold a certifications as a Federal Law Enforcement Training Centers Use of Force instructor and NHTSA Standardized Field Sobriety Testing (SFST) instructor. I regularly teach law enforcement officers mandatory Louisiana POST curriculum, including Legal Aspects, Use of Force (Integrated Use of Force Management – Response to Resistive Behavior), Operating While Intoxicated (OWI) Investigations, Standardized Field Sobriety Testing (SFST), and Drug ID and Investigations.

## C. PREVIOUS TESTIMONY AND EXPERT QUALIFICATIONS

In past four years, I have been qualified and/or accepted as an expert in the following matters: *State of Louisiana v. Johnathan Larue*, 35th JDC (No. 20-727) (testified at criminal trial as defense expert in the areas of general police practices, police training, and use of force); *State of Louisiana v. Travis Clay Depew*, 20th JDC (No. 21-CR-453) (testified at criminal trial as prosecution expert in the areas of general police practices and use of force); and *State of Louisiana v. Byron Franklin*, 24th JDC (No. 22-822) (testified at criminal pre-trial hearing as defense expert in use of force and human factors related to self-defense shootings).

I have also testified at the Grand Jury for the Parish of Tangipahoa (21st JDC) in *State v. Craig Dunn* as a proffered expert in use of force and human performance factors related to officer-involved shootings, and in deposition in *Brown v. Baton Rouge Police Dept., et al.,* Middle District of Louisiana (3:23-CV-1313) (testified as proffered defense expert regarding general police practices, police training, and policy and procedure).

## D. FORMAL EDUCATION, PRESENTATIONS, AND PUBLICATIONS

In August 2002, I graduated from the University of Southern Mississippi with a Bachelor of Arts in Criminal Justice and a minor in Forensic Science, with Honors. In December 2017, I received my Juris Doctor from the Southern University Law Center, *Magna Cum Laude*. I am a licensed and practicing attorney in the State of Louisiana and have been admitted since May 2018. Primarily, my law practice at Due' Guidry Piedrahita Andrews Courrege, LC consists of representing plaintiffs in personal injury matters in both federal and state courts. Additionally, I provide *pro bono* legal consultations to law enforcement officers following use of force encounters.

I have presented as a guest speaker and Continuing Legal Education (CLE) instructor for the Legal Exposure Mentorship Program (2021 & 2022), Louisiana Nuts & Bolts Judicial Seminar (2021), Louisiana Association for Justice (2020), and Louisiana District Attorney's Association (2020 & 2022). I have published a law review article entitled, "Drugged Driving: How the

Legalization of Marijuana has Impaired the Ability of the Louisiana DWI Law" in the Southern University Law Review, Vol. 44, Spring 2017, No. 2.

I have also published the following online articles/blogs discussing various legal issues: "The U.S. 5th Circuit Court of Appeals Grants Officer Qualified Immunity in Taser Use of Force Suit" (January 2022); "Louisiana Supreme Court Denies Review of Officer's Liability Arising From 'Code 3' Car Crash" (February 2022); "Louisiana Deputies Arrested for Shooting Death of Unarmed Man – What Now?" (February 2022); "State Flips on No-Pursuit Policy: Is This a Sign of Things to Come?" (May 2022); "Jury Awards $100 Million in Excessive Force Suit" (September 2022); and "Proposed Changes to the Louisiana Pursuit Law: A Glance at the Pros and Cons" (April 2023).

## IV. FACTS AND DATA CONSIDERED

I have reviewed and utilized the following materials to form a factual basis for my opinions:

1) Alabama Uniform Incident/Offense Report (Taylor-Wells 001 – Taylor-Wells 003);
2) Alabama Uniform Arrest Report (Taylor-Wells 004);
3) Toxicological Analysis Report (Taylor-Wells 005 - 006);
4) Request for Blood or Oral Sample for Alcohol/Drug Analysis (Taylor-Wells 007);
5) Drug Chemistry Certificate of Analysis (Taylor-Wells 008 – Taylor-Wells 009);
6) Narrative of Cpl. Donald Taylor (Taylor-Wells 010);
7) Saraland Police Department Vehicle Pursuit Form (Taylor-Wells 011);
8) Saraland Police Department Use of Force Report (Taylor-Wells 012);
9) Diagnostic & Medical Clinic Note (Taylor-Wells 013);
10) Saraland Fire Rescue Report (Taylor-Wells 014 – Taylor-Wells 019);
11) Event Chronology (Taylor-Wells 020 – Taylor-Wells 023);
12) Photographs (Taylor-Wells 024 – Taylor-Wells 026);
13) Saraland Police Department Policy/Procedure "Service Weapons" (Taylor-Wells 027 – Taylor-Wells 034);
14) Saraland Police Department Policy/Procedure "Traffic Procedures" (Taylor-Wells 035 - Taylor-Wells 047);
15) Saraland Police Department Personnel File Justin Wells (Taylor-Wells 048 - Taylor-Wells 174);
16) Saraland Police Department Personnel File Donald Taylor (Taylor-Wells 175 - Taylor-Wells 375);
17) Declarations Page (Taylor-Wells 376 - Taylor-Wells 377);
18) Taylor's Responses to 1st Set of Interrogatories and Requests for Production;
19) Taylor's Responses to 1st Set of Requests for Admissions;
20) Taylor's Supplemental Responses to 1st Set of Interrogatories and Requests for Production;
21) Wells' Responses to 1st Set of Interrogatories and Requests for Production;
22) Wells' Responses to 1st Set of Requests for Admissions;
23) Wells' Supplemental Responses to 1st Set of Interrogatories and Requests for Production;
24) Plaintiff's Complaint; and

25) Fifteen (15) Videos.

## V. BASIS FOR OPINIONS

The opinions expressed in this report are based upon the facts and data as presented in the materials provided to date, which have been identified in Section "IV". Further, I have relied upon my specialized knowledge, experience, education, and training in general police practices, drug identification and investigations, DUI investigations, and use of force principles acquired throughout my law enforcement career, my continued research and education, and my application and instruction of these topics as a consultant and trainer.

### A. AUTHORITIES

I have specifically relied upon and reference the following authorities to support my opinions:

1) *Graham v. Connor*, 490 U.S. 386 (1989);
2) National Consensus Police and Discussion Paper on Use of Force (2020);
3) Strategic Self-Defense & Gunfighting Tactics, Vanguard Level One Student - Operator Program (2018);
4) Threat Pattern Recognition – Use of Force, Human Factor Research Group, Inc. (2017); and
5) NHTSA – DWI Detection and Standardized Field Sobriety Testing Instructor Guide (2023).

### B. SUMMARY OF EVENTS[1]

On June 28, 2022, at approximately 9:22 a.m., Cpl. Justin Wells and Sgt. Tywone Johnson of the Saraland Police Department were in a marked police vehicle patrolling the area of Shelton Beach Extension and Highway 158. The officers were contacted by a citizen regarding a vehicle travelling south on I-65 that almost ran her off of the roadway. Cpl. Wells was quickly able to observe and position his unit directly behind the vehicle. Cpl. Wells initiated his lights and sirens in an effort to conduct a traffic stop on the vehicle.

The vehicle failed to yield and continued south on I-65. The vehicle was observed swerving out of the lane of travel and having a near miss with an 18-wheeler. The vehicle continued at approximately 65 miles per hour at times driving on the left shoulder and at others on the right. At one point, Cpl. Wells positioned his patrol unit next to the vehicle and Sgt. Johnson gave verbal commands for the driver to pull over. The vehicle ultimately exited I-65 onto Springhill Avenue. Cpl. Wells passed the vehicle on the driver's side and was able to pull in front of the vehicle. The vehicle stopped under an overpass. There were four police units surrounding the vehicle—several with their sirens still activated.

[1] The "Summary of Events" is not an exhaustive recitation of every fact, but merely an overview of the case.

Officers approached the vehicle from both sides—some with weapons drawn. Cpl. Wells approached the driver's door as another unidentified officer held cover on Mrs. White as he stood near the A-pillar. The driver, Patricia White, can be observed looking down and to the left. Officers gave verbal commands for Mrs. White to get out of the car. Cpl. Wells knocked on the window and, according to his report, Mrs. White looked "confused." In response to the officers' commands, Mrs. White rolled down her passenger window and looked to Sgt. Johnson as he unlocked the vehicle's doors.

Cpl. Donald Taylor approached the vehicle from behind, opened the driver's door, and stepped between Cpl. Wells and the vehicle. Mrs. White's hands are visible on body camera and were clearly empty. Cpl. Taylor immediately reached into the vehicle and placed his right forearm across Mrs. White's upper torso and/or neck and with his left hand unbuckled the seatbelt. Cpl. Taylor advised Mrs. White that she was under arrest and to "relax."

Cpl. White immediately placed both of his hands on Mrs. White's left arm and stepped backwards pulling her upper torso slightly out of the vehicle. As Mrs. White's body moved back slightly back into the vehicle, and with no other verbal commands to exit, Cpl. Taylor stepped backwards forcibly pulling Mrs. White out of the seat. Mrs. White uncontrollably fell to the ground and landed on her left side. The vehicle was still in drive and rolled forward.

Mrs. White was handcuffed and placed in the back of a patrol unit. Mrs. White identified herself to Cpl. Taylor upon request. Mrs. White waived her rights per *Miranda* and stated that she did not stop for pursuing vehicles because she first saw the officers on "65" and was apparently confused on where she should safely stop. Mrs. White stated that she was on the way to physical therapy for an injured hand. Mrs. White denied drinking alcohol and admitted to taking blood pressure medication.

Mrs. White told Cpl. Taylor that officers hurt her wrist when they pulled her from the vehicle and later complained of a dislocated shoulder. Mrs. White noted that initially that officers did not say to get out the car, but then went on to say that an officer was beating on her window, who ordered to get out of the car. She began to follow the order to get out when she was grabbed and pulled from the vehicle before she could comply.

Officers searched the vehicle and located 26 unmarked capsules containing a white powdery substance in a clear plastic bag in the glove compartment. Cpl. Wells then spoke to Mrs. White while she was still detained in the unit. Cpl. Wells asked Mrs. White about the pills found in the vehicle, and she said she had "no idea" of what they were. She then asked if the pills were located "in the glove box" and admitted she is the only person to drive the vehicle. Cpl. Wells asked if she was under the influence or had medical problems, to which she stated she did not.

Cpl. Taylor verbally noted that Mrs. White looked like she was "high" on either pills, narcotics, or cocaine. Cpl. Taylor also noted that Mrs. White was "lethargic" and "not responding" with slow speech. Cpl. Wells' report notes that Mrs. White looked to be confused about the situation and "under the influence," but did not describe the physical manifestations of impairment on which he based his conclusion.

Mrs. White was transported to the jail. However, due to complaints of arm/should pain, she was transported to the Mobile Infirmary Saraland ER. Mrs. White consented to a blood draw, which was administered by ER personnel. She was ultimately booked for possession of cocaine, attempting to allude a police officer, and DUI.

Mrs. White's blood results later returned as negative for controlled substances or alcohol. Further, the capsules were identified by the lab as Tramadol. Mrs. White's physician certified that she had a prescription for the Tramadol pills.

## VI. OPINIONS AND ANALYSIS

Based upon my specialized knowledge, experience, education, and training, I have formed the following opinions regarding this matter:

### A. THE FORCE USED BY CPL. TAYLOR TO REMOVE MRS. WHITE FROM THE VEHICLE WAS NOT CONSISTENT WITH GENERALLY ACCEPTED POLICE PRACTICES AND USE OF FORCE PRINCIPLES

#### 1. THE *GRAHAM* FACTORS APPLIED

In *Graham v. Connor*, the United States Supreme Court established the standard of review of an officer's use of force as an objective one. Determining whether the force used to effect a particular seizure was reasonable requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, and its proper application requires careful attention to the facts and circumstances of each particular case.

The *Graham* Court set forth the following factors to assist in the review of a use of force: (1) the severity of the crime; (2) the immediacy of the threat to the officer; and (3) whether the suspect is actively resisting arrest and/or the suspect is evading arrest by flight. Each factor is evaluated together while considering the specific circumstances of an individual case to determine if probable cause existed to use force.

The first *Graham* factor is severity of the crime. Mrs. White failed to yield to emergency vehicles that were attempting to make a lawful traffic stop. Mrs. White was charged pursuant to AL Code § 13A-10-52, which is a misdemeanor crime because her actions did not cause an actual death or physical injury to innocent bystanders or third parties. Once the vehicle stopped, Mrs. White was slow to respond to commands; however, officers did not see fit to charge her with resisting arrest, despite the fact they used force to remove her from the vehicle, which resulted in an injury to her shoulder. The government interest in detaining Mrs. White and preventing her from continuing to drive while disoriented supports the use of some level force to effect her detention.

The second *Graham* factor is immediacy of the threat of danger to the officer posed by the subject's actions. To aid in evaluating the immediacy and credibility of threats, officers are instructed to consider the subject's intent to harm the officer and the means and opportunity to

carry out that harm. To further assist with the threat assessment, officers are trained to look to pre-assault indicators, such as balling of fists, blading of the body in a fighting stance, posture, staring, or moving toward the officer. Additional factors may include the size, age, and physical condition of the subject versus the officer, the distance of the parties in the encounter, the presence of weapons, known history or mental condition of the suspect, number of suspects versus the officer, verbal threats, injuries sustained, fatigue, etc.

Mrs. White's vehicle was stopped behind Cpl. Wells' patrol unit, and as Cpl. Wells approached her vehicle from the front, Mrs. White can be observed looking down and to the left. The then 73-year-old, 5'3", 145 pound, "confused" female, who was seated and restrained in her vehicle, displayed no apparent intent to harm the five police officers that approached her vehicle. Mrs. White rolled the passenger window down and stated that she was attempting to follow the orders to exit, but was pulled out of the car before she could comply.

Once the door was open, her hands were clearly visible on body camera and it was known that she was not holding a weapon. Presumably, her hands were always visible to the officers and there is no mention in any report of Mrs. White ever making any furtive movements that could be construed as her attempting to arm herself. In addition to not being armed, Mrs. White's physical ability to overpower and harm the officers to any degree of concern is minimal, at best. Mrs. White's actions of responding slowly to commands did not create a credible and immediate threat to the officers' safety.

The third *Graham* factor is whether the suspect is actively resisting arrest and/or the suspect is evading arrest by flight. Again, officers did not charge Mrs. White with resisting arrest and her flight, if ever it was intentional, had ceased. Mrs. White was given several commands to exit the vehicle from officers on the outside of the closed vehicle, all while police sirens were whaling and echoing under the overpass. Once Sgt. Johnson unlocked the doors, Mrs. White claims she was trying to follow the orders. However, Cpl. Taylor gave no time for compliance and pulled her from the vehicle—all while never giving her a verbal warning or command other than to "relax."

Accordingly, it is my opinion that Mrs. White posed no immediate threat of harm to the officers and she was not resisting arrest at the time of her apprehension. Although there was a government interest in effecting her detention, taken together, the *Graham* factors do not support the technique or level of force used by Cpl. Taylor. Cpl. Taylor's actions were not consistent with generally accepted police practices and use of force principles (as discussed in further detail below).

### 2. THE LEVEL OF FORCE USED BY AN OFFICER MUST NOT EXCEED THAT WHICH IS NECESSARY TO OVERCOME THE RESISTANCE

In addition to the aforementioned constitutional-based analysis, it also must be determined if the level of force used was necessary to overcome the resistance. To determine if force was necessary, it need be decided whether the force option used created a similar or slightly higher risk of injury compared to the risk of injury created by the subject's actions. There is no requirement that the force used be the option with the smallest or least risk to the subject so long as the force

option was objectively reasonable. Accordingly, there may be many force options that are a reasonable response to the subject's resistance.

To assist with this analysis we look to relevant training, policy/procedure, and generally accepted police practices. Two of the commonly utilized use of force and defensive tactics training programs are known as Human Factor Research Group - Threat Pattern Recognition (formerly PPCT Defensive Tactics) and Strategic Self-Defense & Gunfighting Tactics (SSGT). HFRG and SSGT generally identify levels or types of subject resistance and the corresponding levels of officer response or control. These categories serve to illustrate how certain use of force and defensive tactics are reasonably applied to a subject's resistance, and do not act as a set rule or predetermined response to every situation.

National training protocols and the National Consensus Policy on Use of Force have recognized that a formal "force continuum" is becoming a less accepted practice in favor of the "integrated" or constitutional-based use of force approach that is described above. Although the *Graham* Court warned of attempts of mechanical application to review use of force encounters, HFRG and SSGT defensive tactics are generally accepted in police practices and use of force training as reasonable responses to the corresponding levels of resistance. Combining the language and principles from HFRG, SSGT, and other use of force training that I have attended, the levels of non-deadly force resistance can be described as passive or verbal non-compliance, active or defensive, and aggressive.

Passive or verbal non-compliance consists of a suspect verbally and/or physically refusing to comply with orders. Generally accepted responses include verbal commands and empty-hand control techniques. HFRG specifically designates "soft" empty hand control for this level of resistance, which includes strength techniques, joint locks, and pressure points. All of these techniques are designed to have little or no potential for injury.

Active or defensive resistance consists of physically evading the officer's control by pushing, pulling, bracing, or any other act that would prevent the officer from gaining control, but not an attack on the officer. Generally accepted responses include the aforementioned "soft" empty hand control techniques, and at times, "hard" empty hand control or the use of intermediate weapons when lower forms of control have failed or likely will fail. "Hard" empty hand control techniques allow for strikes. These techniques have a probability of injury in the form of bruises, contusions, or lacerations.

Aggressive resistance consists of a physical attack of the officer, but not to the level where the officer will suffer death or serious bodily injury. The attack may consist of the subject advancing, challenging, punching, kicking, grabbing, or wrestling the officer. Generally accepted responses include "hard" empty hand controls and intermediate weapons, which includes the use of chemical agents, impact weapons, and conductive energy weapons.

Saraland Police Department's own policy/procedure entitled "Service Weapons" outlines similar legal precepts and descriptions of force; however, it does not define the levels of resistance:

> A member may use only that force necessary to effect an arrest or otherwise accomplish an assigned task lawfully. Each member is specifically charged with knowing and remaining competent in the law of the United States and the State of Alabama with regard to when and how force may be used. Force that an officer uses to gain control over a subject is divided into the following categories:
>
> (1) Officer/citizen-verbal direction
> (2) Soft hand control
> (3) Electronic incapacitation devices
> (4) Freeze +P aerosol restraint
> (5) Intermediate weapons
> (6) Lethal force

Mrs. White's actions did not give rise to a formal resisting arrest charge as she was not arrested for such. Mrs. White's only "resistance" to the officers was moving too slowly for Cpl. Taylor's patience. From the time Cpl. Taylor opened the door until he forcibly removed her from the vehicle, approximately 10 to 12 seconds elapsed. Cpl. Taylor gave no verbal warning or commands himself for Mrs. White to exit, and, even if he would have, gave no time for the "confused" 73-year-old to meaningfully comply. In my opinion, Mrs. White's actions were not considered "resistance" as applied in a police practice and use of force context.

Because Mrs. White was not physically resisting, a more appropriate response would have been for the officers to slow down, assess the situation for what it was based on all of their new observations—a 73-year-old woman looking confused and disoriented who posed no physical threat—and attempt verbal de-escalation or "officer/citizen-verbal direction." Had Cpl. Taylor taken a moment to assess the potential dangers, he would have realized the vehicle was in "DRIVE" and it was unsafe to remove the person in control of the vehicle in a dynamic fashion—one of the many benefits of de-escalation.

The National Consensus Policy on Use of Force defines de-escalation and directs its employment as follows:

> Taking action or communicating verbally or non-verbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary. De-escalation may include the use of such techniques as command presence, advisements, warnings, verbal persuasion, and tactical repositioning.
>
> ***
>
> 1. An officer shall use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training whenever possible and appropriate before resorting to force and to reduce the need for force.

2. Whenever possible and when such delay will not compromise the safety of the officer or another and will not result in the destruction of evidence, escape of a suspect, or commission of a crime, an officer shall allow an individual time and opportunity to submit to verbal commands before force is used.

Cpl. Taylor's actions and the time before he resorted to physical force completely disregarded generally accepted de-escalation practices and Saraland Police Department's verbal direction policy/procedure. Cpl. Taylor gave no independent directions for Mrs. White to exit the vehicle before pulling her toward the precarious position of uncontrollably falling out of the open driver's door. Further, there was no attempt to stabilize the situation and allow for Mrs. White to comply—as would be expected with a "suspect" in this physical condition.

However, assuming, *arguendo*, that Mrs. White should have heard the commands to exit the vehicle from her closed vehicle amidst the blaring sirens from numerous patrol units, and she should have responded faster, her actions would be described as verbal non-compliance. An appropriate response to immediate verbal non-compliance is verbal direction and eventually, if not heeded, soft empty hand control techniques. Cpl. Taylor gave no verbal directions other than for Mrs. White to "relax" and used force that exceed soft empty hand control (discussed below).

Once the door was opened, Mrs. White's action of remaining seated, at best, could be described as passive resistance because she did not attempt to defeat Cpl. Taylor's attempt to touch or control her. Regarding passive resistance, HFRG specifically notes:

> At some point, it may become necessary to use force (e.g., soft empty hand techniques, i.e., pressure points, joint locks, etc.) to resolve the situation. The selection of a reasonable control method or compliance technique is crucial. The objective is to resolve the situation using a control technique that will be effective and has the least potential for injury to officers and subjects.

Again, assuming that the 10 – 12 seconds from the time the door was opened to the application of force was a sufficient time to comply, HFRG directs that pressure points, joint locks, or strength techniques would be appropriate. Critically, the selection of the force option must consider the risk of injury to the subject.

Cpl. Taylor's actions of pulling Mrs. White from the vehicle can be best described as a straight armbar takedown, which employs a dynamic movement against the arm that forcibly rotates the subject's front torso toward the ground—often resulting in an uncontrolled fall. HFRG provides for use of the technique during defensive resistance as when a subject is pulling or pushing away to defeat the officer's control.

It should be noted that Cpl. Taylor's report mentions that Mrs. White, "began to grab what appeared the steering wheel to prevent officers from pulling her from the vehicle." If Mrs. White would have completed the grab and her 73-year-old grip prevented Cpl. Taylor and his backup from continuing to "guide her" from the vehicle, then perhaps her actions would be defensive resistance.

However, based on the totality of these circumstances, it is more reasonable to perceive Mrs. White's actions as a reaction to being pulled without warning and without having time to steady and balance herself for the exit. Subjects very often have some reaction to the application of force and such a response should be expected. Or perhaps, she was attempting to place her vehicle in "PARK" so that she could safely exit and not injure herself or the officers. This is why it is critical for an officer to give clear and concise commands and allow the subject time to comply in situations where there is minimal threat to the officer.

The potential for injury resulting from a straight armbar takedown largely depends on the ground conditions and the force that the officer utilizes in employing the technique. In this case, Mrs. White was elevated in a Jeep SUV—increasing the risk of injury from a traditional standing position. Further, Mrs. White's age and physical condition should have been considered before forcing her to uncontrollably fall onto the roadway from any elevation and likely should have been avoided barring extraordinary circumstances that did not exist here.

Accordingly, it is my opinion that the use of force employed by Cpl. Taylor of forcibly pulling Mrs. White from the vehicle without giving her orders or time to comply with orders from other officers to exit the vehicle is not consistent with generally accepted de-escalation and use of force principles.

Further, even assuming that Mrs. White was verbally or passively resisting, Cpl. Taylor's actions exceeded the level of force necessary to overcome the resistance because Cpl. Taylor's actions created a substantially high risk of injury to Mrs. White compared to no apparent risk of harm to the officers. In addition to de-escalation, other less dangerous options such as strength techniques, joint locks, or pressure points would have been more appropriate under these circumstances.

### B. THE DUI INVESTIGATION WAS NOT CONSISTENT WITH GENERALLY ACCEPTED POLICE PRACTICES AND SARALAND POLICE DEPARTMENT POLICY AND PROCEDURE

Saraland Police Department policy/procedure identified as "Traffic Procedures" and found in Article II Sections 2.400 – 2.405 discuss DUI arrests and investigations. Particularly, Section 2.404 is entitled, "D.U.I. ARREST AND CHEMICAL BREATH TEST" and states the following:

> If the officer observed signs (i.e., staggering, slurred speech, smell of alcohol, bloodshot eyes, etc.) that lead him or her to believe that the driver of the vehicle may be operating the vehicle under the influence of intoxicated liquor or other substance, the officer should have the operator perform the Standardized Field Sobriety Tests. The Standardized Field Sobriety Tests should be used to see if the driver needs further testing (i.e., chemical breath test).
>
> The Standardized Field Sobriety Tests are:
>
> (1) One leg stand
> (2) Walk and Turn

(3) Horizontal Gaze Nystagmus (HGN)

As a matter of procedure, the arresting officer should notate his/her observations as soon thereafter as circumstances allow.

Mrs. White was charged with DUI pursuant to AL Code § 32-5A-191 for allegedly driving under the influence of a controlled substance. The officers who encountered Mrs. White described her as "confused," "non-responsive," "lethargic," "under the influence," and "high." To my knowledge, there are no other physical manifestations of impairment described or noted by the officers in the reports. Mrs. White denied taking any controlled substances other than blood pressure medication and denied drinking alcohol.

Despite their suspicions of impairment, the officers failed to perform Standardized Field Sobriety Tests (SFST's) as directed by Saraland Police Department policy/procedure in an effort to collect credible evidence to support their conclusory beliefs of impairment. To my knowledge, other than as described above, the officers took no other investigative steps to attempt to discover the cause of the confusion and non-responsive behavior besides the subsequent blood draw at the hospital. In absence of a drug recognition expert evaluation, SFST's would have been the appropriate in-the-field investigative measure to aid in determining if Mrs. White was impaired on a controlled substance and in making an arrest decision.

If the officers had performed SFST's, a preliminary examination of the eyes before conducting the Horizontal Gaze Nystagmus (HGN) test would have been used to rule out medical emergencies and conditions. Officers are trained to look for resting nystagmus, equal pupil size, and equal tracking of the eyes. Officers are cautioned as follows: "Even though the possibility of alcohol and/or drug impairment exists, officers should be aware of medical conditions having symptoms in common with alcohol influence."

However, because the officers failed to conduct SFST's in violation of their own policy/procedure, they were unable to reliably determine to any degree of certainty whether the indicators they observed were actually caused by a controlled substance or alcohol, or perhaps were symptoms of a medical condition or emergency. Mrs. White noted that she suffered from high blood pressure and an EMS examination on scene could have assisted in ruling out a medical emergency at that moment in time and aided in making correct arrest decision based on the totality of the circumstances.

Additionally, as part of the SFST certification course, officers may be offered an introduction to drugged driving block of instruction. It is unknown to me if any of the officers involved in this incident have received this training. However, the information is easily accessible and should be considered when effecting a controlled substance DUI arrest to make a reasonable determination of whether the physical manifestations observed are consistent with drug impairment.

The officers in this case mistakenly believed that Mrs. White was in possession of cocaine and charged her with controlled substance DUI—presumably based on the possession of the suspected cocaine. The SFST training provides that cocaine is a CNS Stimulant and notes the following:

> People under the influence of CNS Stimulants tend to be hyperactive indicated by nervousness, talkativeness, and an inability to sit still. They also have difficulty concentrating for any length of time. General indicators of CNS Stimulant influence are:
>
> • Anxiety
> • Body tremors
> • Euphoria
> • Exaggerated reflexes
> • Excited
> • Grinding teeth (bruxism)
> • Redness to nasal area
> • Restlessness
> • Talkative
>
> Eye indicators of CNS Stimulant influence:
>
> • Neither HGN nor VGN will be observed
> • The pupils generally will be dilated

The officers' observations of Mrs. White's physical manifestations were inconsistent with that of cocaine impairment as described in the training. In fact, Mrs. White's condition more resembled that of being under the influence of a CNS Depressant, which is described as follows:

> General indicators of CNS Depressant influence are:
>
> • Disoriented
> • Drowsiness
> • Drunk-like behavior
> • Slow, sluggish reactions
> • Thick, slurred speech
> • Uncoordinated
> • Unsteady walk
>
> Eye indicators of CNS Depressant influence are:
>
> • HGN usually will be present
> • VGN may be present (with high doses)
> • Pupil size usually will not be effected, except Methaqualone, Soma, and certain antidepressants may cause pupil dilation

The officers made no documented attempt to explain or decipher the discrepancies in the seized physical evidence versus the physical manifestations of Mrs. White. DUI investigations require that arrests be based on the totality of the circumstances, which in this case, appear to have been not considered.

Accordingly, it is my opinion that the officers failed to follow generally accepted police practices for controlled substance DUI investigations and also violated the Saraland Police Department policy/procedure by failing to perform SFST's.

### C. THE IDENTIFICATION OF THE 26 CAPSULES AS COCAINE WAS NOT CONSISTENT WITH GENERALLY ACCEPTED POLICE PRACTICES AND DRUG IDENTIFICATION AND INVESTIGATION PROCEDURES

The officers located a clear plastic bag in the glove compartment that contained 26 capsules. The capsules were not marked with identifying imprint and contained a fine white powdery substance. The amount and texture of the substance in each capsule appeared to be very consistent. Capsules of this nature are often seized during drug investigations. Unless located in a bottle, which often times is a supplement or vitamin since there are no markings on the capsules, the most reliable method of identification is submission to a crime lab.

This is not to say that illicit drugs are not seized in capsule form. Officers routinely find fentanyl, methamphetamine, MDMA, or combinations of these substances in these forms. However, often times there are indicators that these capsules are not professionally manufactured, such as inconsistent amounts and color of its contents, the capsule being loose and easily separated, the capsule being soft to the touch, etc.

The nature and circumstances of when, where, and how the seizure was made is also important to consider when attempting to identify unknown drugs. Further, knowledge of how drugs are commonly ingested and packaged is helpful. With this in mind, I have never personally seized nor am I aware of a seizure of powder cocaine in capsule form. I would find it highly unlikely to encounter such because swallowing the cocaine would be the least effective way to experience the high compared to the common methods of snorting or injecting.

The officers in this case used a NARK II Scott Reagent (Modified) test kit to identify the contents of the capsules as cocaine. Sirchie, the manufacture of the test kit, provides the following warnings in making such identifications:

> The Scott Reagent Modified is a presumptive test designed not only to identify Cocaine but to distinguish the difference between Cocaine HCl (powder) and Cocaine Base (crack or freebase). Like all our NARK II narcotic field tests, the Scott Reagent is meant for presumptive field drug testing. 10 tests/box.
>
> NOTE: ALL TEST RESULTS MUST BE CONFIRMED BY AN APPROVED ANALYTICAL LABORATORY! The results of this test are merely presumptive. NARK® only tests for the possible presence of certain chemical compounds. Reactions may occur with, and such compounds can be found in, both legal and

> illegal products. This test must be administered following its specific instructions and may be used in conjunction with other reagents in the NARK® II Sequential Testing System.[2]

It is well known in law enforcement that reagent test kits are prone to false positives and careful attention must be given to the totality of the circumstances surrounding the investigation. In my opinion, mere reliance on a presumptive test kit to establish probable cause would be inconsistent with basic drug identification and investigation procedures.

Further, the presence of blue and pink after a reagent test is performed does not mean that the substance is presumed to be cocaine:

> The Scott Reagent Modified is a presumptive test designed not only to identify Cocaine but to distinguish the difference between Cocaine HCl (powder) and Cocaine Base (crack or freebase). Cocaine HCl will dissolve a Blue solution in the 1st ampoule, where Cocaine Base will not dissolve and form Blue specks in a Pink solution. Both forms of Cocaine will develop a Pink solution in the 2nd ampoule and a Pink over Blue solution in the 3rd ampoule. To eliminate all false positives for other caine substances, watch for the specific bursting of Blue after the breakage of the 3rd ampoule, prior to the development of Pink over Blue.[3]

Here, looking at the photographs of the actual test results, it does not appear that there is a clear and delineated pink over blue. Instead, there is a pink and blue mixture as would be expected in step one when breaking the first ampule. Lacking a clear result from the test, combined with the irregular capsulation of the powder, the officers should have had serious doubt that the substance was cocaine. Instead of making an arrest at that time, the officers simply should have submitted the capsules to the crime lab for analysis and taken action upon receipt of the results.

Accordingly, it is my opinion that the officers' conclusion that the substance in the 26 capsules was cocaine based on the circumstances at hand was not consistent with generally accepted police practices and drug identification and investigation procedures.

## VII. CONCLUSION

I have reviewed the facts and data available to me to date and I have relied upon my specialized knowledge, experience, education, and training in reaching the foregoing opinions. Should additional information become known to me, I reserve the right to amend or supplement my opinions as necessary.

Respectfully submitted,

/s/C. Scott Courrege

---

[2] https://www.sirchie.com/nark-ii-scott-reagent-modified-cocaine-salts-base.html (last accessed 8/6/24).

[3] https://www.oherron.com/scott-rgnt-modified-cocaine.html (last accessed 8/6/24).

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 1:24-CV-00054-TFM-B

PATRICIA WHITE,
Plaintiff,
vs.
DONALD TAYLOR and JUSTIN WELLS, et al.,
Defendants.

* * * * * * * * * * * * * *

THE ORAL PROCEEDINGS
OF THE DEPOSITION OF CHARLES COURREGE
OCTOBER 15, 2024

REPORTER: Paul Morse
Certified Court Reporter
and Notary Public

EXHIBIT B

opportunity -- a command and an opportunity, I would expect for someone to feel off balance and maybe try to steady themselves. But again, that's a reaction that's going to be a human reaction. And I wouldn't -- I wouldn't classify that as an intentional resistance. I think people are going to respond.

Q. Did you see on the video though that she did pull back against him and try to move her body back into the car?

A. You can certainly see her body move back in the car. How forceful that was, I would have to hear Corporal Taylor's testimony or Ms. White's testimony.

Q. But if she were pulling back against him, that, according to your definition in your report, is one of those types of activities that can be considered active resistance. Correct?

A. It could fit the definition of active resistance if she was intentionally engaged in that to try to overcome to officer's force. We encounter the same situation with,

say, like bigger people who have broad shoulders or heavyset people. We try to force their hands behind their back. Their hands are going to naturally start to go back forward. And it doesn't mean that they're intentionally resisting attention.

So we can't then go to escalate force merely because their arms aren't doing what we thought they should do. We have to evaluate the totality of the situation and say, was this person really resisting or is this a response to what I'm doing. Because if it's a response to what you're doing, again, you just stop; is there really a threat here; de-escalate this. The part I really take issue at is Corporal Taylor's stature. I don't know his statistics, his size, weight. But he's a healthy looking police officer.

And we have a 73-year-old woman who even if she intentionally grabbed the steering wheel -- let's assume for a moment she did intentionally grab that steering wheel. I think continuing to forcefully slowly pull her from the vehicle

apply the pain compliance and then say, well, he jerked his arm away so now I get to start striking him in the face, that would defy all use of force principles. And I think in this situation by immediately going to the hands on without de-escalating, telling her, ma'am, to step out of the car, she's going to respond to a forceful pull, particularly when she's unsteady and her feet aren't out of the car. I think that's a natural human reaction. I don't think that's intentional resistance.

Q. Well, this wasn't a situation where a taser was used in a pain compliance technique on Ms. White, is it?

A. No. Just an example of. We see this. This is a -- it's a well understood principle that there's going to be a reaction to your force. And it doesn't mean that's an intentional resistance.

Q. The use of Officer Taylor's sort of soft hand trying to guide her out with her left arm, that wasn't a pain compliance technique, was it?

Q. Yeah. Or got there right as they were stopping her vehicle basically?

A. Correct.

Q. Yeah. And I think you said you had not viewed -- or reviewed the video of Ms. White?

A. The video?

Q. The deposition. I'm sorry.

A. No. I've not reviewed any depositions.

Q. That was going to be my next question, if you had seen any depositions.

A. No, sir.

Q. So that covers that. Have you reviewed any of the court records from the charges that she was charged with, the district court files?

A. It wasn't in this list. I don't believe so. Yeah, I don't believe that was -- I don't think I did.

MR. GAILLARD: I think that's all I've got.

MR. DENNIS: I don't have any

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

PATRICIA WHITE,

Plaintiff,

Vs.

CIVIL ACTION NO. 1:24-CV-00054-TFM-B

DONALD TAYLOR and JUSTIN WELLS; et al.,

Defendants.

* * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF JUSTIN WELLS, taken pursuant to stipulation and agreement before Haley M. Phillips, Certified Court Reporter, ACCR # 151, and Commissioner for the State of Alabama at Large, in the Law Offices of Taylor Martino Rowan, 455 St. Louis Street, Mobile, Alabama, on Wednesday, October 2, 2024, commencing at approximately 10:11 a.m.

* * * * * * * * * * * * *

EXHIBIT C

A. I did not. I really couldn't see the right hand --
Q. Okay.
A. -- from the angle that I was at because I was still trying to kind of blade myself just in case if she did have a weapon that I could like move back.
Q. Right.
But you didn't have any indication that she had a weapon?
A. Not at that moment. At that moment I was just -- I just wanted to get out of the car.
Q. Okay.
A. Because that's one reason I didn't have my gun in my hand because I was focused on getting her out of the car. I already had cover with a gun. I already had cover with a Taser, so ...
Q. All right. And so she rolls down the passenger's side where Johnson is.
A. Yes, sir.
Q. And -- And did -- At that -- I know you

Q. Okay. At this time did you -- What signs of impairment that would indicate that she was intoxicated or on cocaine did you see?

MR. GAILLARD: Object to the form.

A. I never said she was intoxicated on cocaine. I never believed she was intoxicated on cocaine.

MR. DENNIS: Can we take a quick break? I'm sorry.

THE VIDEOGRAPHER: Off the record.

(Brief recess was taken.)

THE VIDEOGRAPHER: We're on the record at 11:51.

BY MR. DENNIS:

Q. I am going to show you -- So off the record, Officer Wells, we were talking about -- You didn't charge her with driving under the influence of cocaine specifically. You charged her with driving under the influence of a controlled substance; right?

A. Yes, sir.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

PATRICIA WHITE,

Plaintiff,

Vs.

CIVIL ACTION NO. 1:24-CV-00054-TFM-B

DONALD TAYLOR and JUSTIN WELLS; et al.,

Defendants.

* * * * * * * * * * * * *

VOLUME I

* * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF DONALD TAYLOR, taken pursuant to stipulation and agreement before Haley M. Phillips, Certified Court Reporter, ACCR # 151, and Commissioner for the State of Alabama at Large, in the Law Offices of Taylor Martino Rowan, 455 St. Louis Street, Mobile, Alabama, on Tuesday, October 1, 2024, commencing at approximately 1:49 p.m.

* * * * * * * * * * * * *

EXHIBIT D

sort of movement, and for officer safety -- I don't know if she's reaching for a weapon. I don't know if she's about to drive off in the vehicle. So then she was removed from the vehicle.

(Brief interruption.)

Q. That's all right.

A. Weird. Sorry about that.

Q. Did you have any indication that she had a weapon in her vehicle?

A. In the vehicle, no. But the vehicle was considered a weapon. It could hurt anybody. She could have drove off and hit somebody.

Q. Did you have any indication that she was reaching for a weapon?

A. Based on her movement to the passenger's side of the vehicle, she could have been reaching in her glove box for a weapon, could have been pulling away from me to get away from me to continue driving away. Based on that the vehicle at that point is a weapon. But on her sudden movement,

making that movement to the passenger's side, I believed that she could have been reaching for a weapon.

Q. All right. On Plaintiff's Exhibit 18, your -- That's your narrative. You said, I opened the driver door, reach over the driver and unbuckled her seat belt. I then grabbed the driver's left hand to guide her from the vehicle.

Did you write that?

A. Yes.

Q. The driver began to grab what appeared the steering wheel to prevent officers from pulling her from the vehicle (as read). I then pulled the driver by the left arm, pulled her from the vehicle and placed her on the ground. You -- You wrote that?

A. I did.

Q. Is there any reason why you used the verb "pulled" instead of yank?

A. I didn't yank her. I pulled her -- pulled her away from the vehicle.

Q. Okay. Is there any reason why you used the

Q. Did you know if the car was in drive or park?

A. At that time we thought it was in park.

Q. Did you -- At any point during this time period, did you take into account her age?

A. I didn't know how old she was.

Q. Well, you knew she wasn't a spring chicken; right?

MR. GAILLARD: Object to the form.

A. You have to define a spring chicken for me.

Q. You knew that she was -- You knew that she was -- that she was elderly; right?

A. No. She was middle-aged from what it looked for me, older person. Older than my age.

Q. Okay. Was there any indication that she had a weapon in her vehicle?

A. She was in control of a weapon, which is the vehicle itself. But when she made the movement -- when she made the movement, I didn't know if she was reaching for a weapon or what else might have been inside the vehicle.

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

PATRICIA WHITE, )

Plaintiff,

) CASE NO.

vs. ) 1:24-CV-00054-TFM-B

DONALD TAYLOR and

JUSTIN WELLS; et al., )

Defendants. )

****************************************

DEPOSITION OF

DEVIN O'SHEA

****************************************

December 30, 2024

EXHIBIT E

Saraland, Alabama

EXAMINATION BY MR. GAILLARD:

Q Sergeant O'Shea, I just have a couple of follow-ups. You were asked some questions earlier where there was some testimony about officers slightly veering off the language of a policy. Do you recall that discussion?

A Yes.

Q And is that kind of in line with what you said earlier that the policies and procedures are guidelines for the officers to follow, but they have to use their judgement and their discretion when they're doing their job?

A Yes.

Q Okay. And then there was a question about whether officers should have done field sobriety testing in this case. Do you recall that?

A Yes.

Q Would it be reasonable in this situation, if the suspect requests medical

attention before the field sobriety testing's done, for those officers to take that person to get medical attention and not do the field sobriety testing?

A Absolutely.

MR. GAILLARD: Okay. That's all I have.

MR. DENNIS: Let me follow up on that.

EXAMINATION BY MR. DENNIS:

Q Are you aware, just based off of what you've reviewed, the timeline of Ms. White in this case getting medical attention?

A I don't know the exact time, but it was, I mean, shortly after she was arrested and brought to our jail.

Q Well, do you know if she -- I mean, you know, you probably have -- you haven't watched the videos and -- and probably haven't listened to every piece of dialogue, but are you aware that she was