IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 1:24-CV-00054-TFM-B

PATRICIA WHITE,
Plaintiff,
vs.
DONALD TAYLOR and JUSTIN
WELLS, et al.,
Defendants.

* * * * * * * * * * * * * *

THE ORAL PROCEEDINGS
OF THE DEPOSITION OF CHARLES COURREGE
OCTOBER 15, 2024

REPORTER: Paul Morse
Certified Court Reporter
and Notary Public

EXHIBIT
B

Q. Do you think her actions ever moved from either verbal noncompliance or passive resistance to actual resistance during this encounter?

A. I don't believe she was a resistive subject.

Q. All right. You go on next to the next heading about the level of force used.

A. Yes, sir.

Q. And at the bottom of that page eight, it says in addition to the aforementioned constitutional-based analysis. So are you basically saying that that discussion above we just walked through was the constitutional analysis based on the Graham factors?

A. Yes, sir. Correct.

Q. All right. And it says, it also must be determined if the level of force used was necessary to overcome the resistance?

A. Yes, sir.

Q. And you make a statement, there is no requirement that the force used be the

option with the smallest or at least risk to a subject so long as the force option was objectively reasonable.

A. Correct.

Q. Is it your opinion in this case that the force used by Corporal Taylor to get her out of the vehicle ultimately was not reasonable?

A. Well, I'll answer the question since you asked it. But I was very -- I intentionally didn't use that verbiage in my opinion itself due to court rulings. But I believe that it exceeded the force necessary to overcome the resistance, if any -- if there were any resistance.

Q. And that's based on your Graham factor analysis?

A. It's based on the Graham factor analysis. But in addition Graham is a little confusing because we apply this totality of circumstances test based on these -- on these three factors.

But to really assess the level of force,

I don't know if it was just playing at a different speed. So yeah, I think we have to -- on a de-escalation principle and based on how this pursuit ended and the observations of the officers who were in a position to understand what's going on, I think we have to slow this thing down. And you've got to give someone clear concise commands and then an opportunity to comply with those commands. And I think he rushed into this situation without giving her sufficient time based on what these officers, particularly what Corporal Wells was probably observing at that point.

Q. So how much more time would you say should have been given before they tried to remove her from the vehicle?

A. Well, I think that's hard to say because it would depend upon her actions. Again, we respond based on the suspect's actions. Our response is based on their actions. So in this situation I think opening the door and having a discussion with Ms. White in this vehicle before immediately going to

start getting out of the vehicle?

A. I think based on the situation, she was disoriented. She appeared, quote, confused. She appeared lethargic. I think you've got to give this person a little time to meaningfully comply.

Q. Well, when Corporal Taylor starts taking her left arm and is starting to guide her out of the vehicle, it doesn't appear at least on the video that he's using much more force than just kind of holding her arm and trying to get her to step out of the vehicle initially. Would you agree with that?

A. That's how it appears. So barring the -- I would have liked to have seen some discussion. And then we get to the force itself. I think it was too -- I think it was premature to go to that force because there was no discussion and attempt to de-escalate. However, once he got to that level of force, I agree with what you're saying. It was a soft empty hand. We're always looking at the risk of injury for the suspect versus the risk of

say, like bigger people who have broad shoulders or heavyset people. We try to force their hands behind their back. Their hands are going to naturally start to go back forward. And it doesn't mean that they're intentionally resisting attention.

So we can't then go to escalate force merely because their arms aren't doing what we thought they should do. We have to evaluate the totality of the situation and say, was this person really resisting or is this a response to what I'm doing. Because if it's a response to what you're doing, again, you just stop; is there really a threat here; de-escalate this. The part I really take issue at is Corporal Taylor's stature. I don't know his statistics, his size, weight. But he's a healthy looking police officer.

And we have a 73-year-old woman who even if she intentionally grabbed the steering wheel -- let's assume for a moment she did intentionally grab that steering wheel. I think continuing to forcefully slowly pull her from the vehicle

the person to develop a plan, formulate different tactics, and may cause an escalation of force. But that's different from the de-escalation principle that says when it permits, when it's safe to do so, let's slow things down and create some distance. Let's stabilize the situation to use less force. So if we're hands on -- that training principle that you speak of, if we're hands on and you're actively fighting and you're actively resistive, using less force -- not enough force to overcome could create a danger to us.

So if you go too soft for too long and you don't overcome the resistance, you may get hurt during that process, is kind of the idea of what you first brought up.

Q. And is it your position in this case that Ms. White never exhibited any active resistance to Corporal Taylor?

A. I don't believe she intentionally actively resisted Corporal Taylor.

Q. I'm going to show you what I'm going to mark as Exhibit 11, which is basically

apply the pain compliance and then say, well, he jerked his arm away so now I get to start striking him in the face, that would defy all use of force principles. And I think in this situation by immediately going to the hands on without de-escalating, telling her, ma'am, to step out of the car, she's going to respond to a forceful pull, particularly when she's unsteady and her feet aren't out of the car. I think that's a natural human reaction. I don't think that's intentional resistance.

Q. Well, this wasn't a situation where a taser was used in a pain compliance technique on Ms. White, is it?

A. No. Just an example of. We see this. This is a -- it's a well understood principle that there's going to be a reaction to your force. And it doesn't mean that's an intentional resistance.

Q. The use of Officer Taylor's sort of soft hand trying to guide her out with her left arm, that wasn't a pain compliance technique, was it?

A. No. That's an escort -- it's an escort technique.

Q. Right. So why do you believe she would react or resist or pull back against that when it shouldn't have been causing her any pain?

A. I think if I push Joseph unexpectedly right here from his chair to his right, he's going to grab with his left hand to steady himself. I think common sense tells us that people are going to respond to unexpected situations in a certain way. Corporal Taylor didn't tell her he was going to pull her out of the car. He didn't give her an opportunity to comply. She could have.

Ma'am, go ahead and step out of the car or I'm going to go ahead and pull you out of the car. At that point her mind would say, sure, let me go ahead and move my feet out. I think a snatch, the natural reaction is going to be to try to steady yourself. That just -- it just seems like common sense in a situation like this.

Q. Well, there's been ten to twelve seconds of her not getting out of the car after being ordered to do so. And then he told her she was under arrest and started guiding her out with her left arm. Correct?

MR. DENNIS: Object to the form.

A. Well, the problem we have with that is he leaned his body weight across her with his forearm across her chest or neck during most of those ten to twelve seconds and un-seatbelted her. So she, I don't believe, could have complied with an order to get out of the car during that time period. He was leaning on her.

Q. And it's still your position that when she pulled back against him into the vehicle, that was not active resistance?

A. If you -- not from what I understand. From the facts that I have in front of me, no, I don't believe it was. I think it's a response to his jerking her without a warning and without giving her a command.

Q. So it sounds like though it's your position that the officer has to know whether the suspect is intending to resist or not for it to be active resistance?

MR. DENNIS: Object to the form.

A. No. It's -- it's a factor that you have to take into account. If you use force unexpectedly, if you strike someone unexpectedly, if you don't give someone a command, they're likely going to respond physically in some way. I can't then charge that person with a crime or then put it on them and say, well, that was some sort of active resistance when it's a natural human response. People are going to respond. People are going to respond.

So I think in this case if you would have followed the use of force principles and de-escalated, gave her a clear and concise command, gave her a meaningful opportunity to comply, then if she's not complying and she forcefully grabs the steering wheel, we can say, okay, now she's actively resisting. But

she's going -- humans are going to respond to the application of force. It's a natural response. If they have no warning that it's coming, they're going to.

Q. Just getting somebody by the arm and attempting to guide them out of the driver's seat you think would naturally evoke that person pulling back against the officer?

A. I think if her feet are planted in the car like they are and she's not in a position to turn and get out of the car because she's in a confused or disoriented state, I think that's a huge factor and that needs to be taken into consideration.

Q. Can an officer still reasonably believe somebody is resisting when they pull back against him, whether they have the intent to or not?

A. That's -- I can't answer that. I mean, it's a case-by-case situation. I don't think in this case if Corporal Taylor believed that snatching someone without an opportunity or warning, that they're not going to reach to

try to steady themselves, I don't think that's a reasonable belief.

Q. But we have no information in this case, do we, that says that Ms. White was just reacting to him and not trying to pull herself back into the vehicle?

A. I don't -- I'm not aware of any of those facts. If she says she was trying to overcome his resistance, then there you go. I'll call it active resistance. But again, to then forcefully pull her out of the car knowing that she's going to fall from an elevated position, we still have to -- and that's kind of why I went in my report and I said, for argument's sake let's say she was passively or actively resisting, to use force that you know was going to cause an injury by uncontrollably pulling her from a car -- an elevated car seat versus her holding the steering wheel, I think that exceeds the force necessary to overcome that resistance.

Q. And is that because you think the danger of her still being in control of that

Corporal Taylor, in other words?
A. Yeah. From his perspective again, but he set this in motion. He's the one that pulled her and should understand that there's going to be a response in this situation. So I can't go create an emergency and then say, oops, there's an emergency. So the response -- her response fits with his misapplication of a de-escalation and use of force principles.
Q. So I'm trying to understand. Are you saying that because he initially tried to guide her out of the car, and if she pulled back, that was basically his fault?
MR. DENNIS: Object to the form.
A. I'm saying in this situation, that's a -- that's a very understandable response to his actions. And you should expect a response when you pull someone and don't give them an opportunity to comply. They're going to react. And so yeah, I think if you had come in and slowed the situation down and conversed with her for a second and actually explained to her and gave her an opportunity to comply, I

don't think we're here.

Q. So let's talk about you mentioned de-escalation. And you cite this national consensus policy on use of force in your report.

A. Yes, sir.

Q. Is de-escalation something that is constitutionally mandated?

MR. DENNIS: Object to the form.

A. I'm not sure if de-escalation is constitutionally mandated like a Graham case that we can point to de-escalation. But like I said to you, it is the national standard. And all police officers are trained in de-escalation. And there's a lot of case law on how quickly officers resort to using force. And so in that -- in that sense it's certainly a factor that the courts have recognized as part of the totality of circumstances, without a doubt.

Q. Are you saying that this national consensus policy and discussion paper that we marked as Exhibit 6 is a national standard or

sets a national standard?

A. It's a -- no. It's a recommendation. If you go to the last page, it shows all of the agencies that have participated, International Association of Chiefs of Police, CALEA, which is a national accreditation agency. This has generally been accepted as good policy and procedure. I do not know of any law enforcement agency that doesn't incorporate de-escalation principles and training in their use of force training. All of the training that I have ever attended has incorporated de-escalation. We didn't really call it de-escalation 25 years ago as much, but the principles have always been there.

Q. Do you know how many law enforcement agencies have actually adopted this national consensus policy?

A. I don't know. I can tell you that I've reviewed numerous use of force policies. And most have some sort of very similar language and similar principles. I mean, this

is pretty universally accepted language.

Q. Sheriff's departments make up a big part of law enforcement in this country, don't they?

A. I don't know the percentage of sheriffs versus police.

Q. Would you agree that they make up a large part of law enforcement?

A. Sure.

Q. Do you know that the sheriffs have not adopted this national consensus policy?

MR. DENNIS: Object to the form.

A. Which sheriffs?

Q. The sheriffs, the national organizations.

A. Oh, I don't -- I don't know.

Q. So basically the de-escalation, as I understand it, you're saying that Corporal Taylor should have just waited longer or used more verbal commands with Mrs. White before applying force in this context?

A. Yeah. And I've said it several times. When you give someone a command, you've

got to give them a meaningful opportunity to comply with those commands. He reached in the car. It appeared that his body weight was across her. She -- it didn't seem feasible as she was getting out of the car up until that point or during that part of the encounter. And yes, I think we have to evaluate, slow the situation down. And if it's feasible, talk with people and engage in some conversation and say, hey look, let me give you a chance to comply.

Now, if we engage in that conversation and she reaches back in and pulls away and snatches, okay, then now we've created a different situation. But yeah, I think he had a duty at that point to try to slow this down and assess the situation, which he didn't do. He walked right up. He stepped in front of Corporal Wells, opened the door, and immediately went hands on. I think the other officers were in a much better position. Sergeant Johnson -- is that his name?

Q. He was on the passenger side?

A. Yeah. Sergeant Johnson on the passenger side and Corporal Wells were certainly in a better position to understand what was going on in that car from their vantage points. Corporal Taylor rushing in, stepping between, and then going hands on just doesn't make much sense to me.

Q. I'll read you a section from page nine of this national consensus policy. On the right-hand side of the page the third paragraph down, it says one concern with de-escalation is that it can place officers in unnecessary danger. By overemphasizing the importance of de-escalation, officers might hesitate to use physical force when appropriate, thereby potentially resulting in an increase in line of duty deaths and injuries. Consequently it should be stressed that de-escalation is not appropriate in every situation and officers are not required to use these techniques in every instance.

Do you see that portion?

A. Yeah.

Q. Do you agree with that language?
A. Sure. I agree with that. I think particularly we're -- they're talking about line of duty deaths when it's a deadly force situation. You respond to deadly force with immediate deadly force when appropriate. So what we don't want police officers to think is every situation can be de-escalated because that's not necessarily true and take unnecessary risks.
But when the situation is slowing down naturally and the opportunity has created itself to de-escalate, then yeah, I think we have a duty to continue to de-escalate the situation. So as we've pointed out, in the beginning there was a need to stop Ms. White from driving. I certainly concede that point. And there is a need to contain her vehicle. I concede that point, which Corporal Wells did. There was a need to then get her out of that car. But what happened was when it stopped and she wasn't ramming the vehicles and she wasn't making an attempt to escape and she was rolling

down her passenger window and she was looking around a little confused, those moments create a de-escalation situation where we start to slow this tempo down. We start to talk. We start to recognize this for what it is, not a fleeing felon but perhaps an impaired person. Perhaps. Which I don't think later the evidence supported that.

But whatever it is, we now start to communicate and give her an opportunity to comply with our orders, which Corporal Taylor did not give her an opportunity to do.

Q. Is there any set amount of time that officers should try to use de-escalation before using force?

A. No. That's too -- it's too broad of a question. We would have to just look at facts of each case.

Q. And is there any standard or anything in the documents you provided that tells an officer what types of de-escalation techniques they would need to use in a situation like this before they could use

force?

A. No. Again, it's a case-by-case basis. Everything is going to be case by case.

Q. So in this situation, this is just your opinion based on your review of these facts and your experience?

A. Yes.

Q. Is that anything different than what Ms. White's attorney could argue to a judge or jury in this case?

A. I would say that he could argue that. But certainly hearing from an expert will assist the jury in understanding these use of force principles and what law enforcement officers would be expected to do, especially based on a constitutional analysis.

Q. All right. You talk about on page eleven in the report Corporal Taylor's actions of pulling Ms. White from the vehicle can be best described as a straight arm bar takedown, which employs a dynamic movement against the arm that forcefully rotates the subject's front torso towards the ground, often resulting in an